**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 22-cr-411 (FB) (RML) |
| ) | |
| JOHN LHOTA, ) | |
| ) | |
| Defendant. ) | |

## SENTENCING MEMORANDUM OF JOHN LHOTA

Mark Lesko
Daniel P. Filor
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017
(212) 801-9200

*Attorneys for John Lhota*

<h1 align="center">TABLE OF CONTENTS</h1>

I. PRELIMINARY STATEMENT ........................................................................................ 1

II. JOHN LHOTA'S PERSONAL HISTORY AND CHARACTERISTICS ........................ 2

    A.    John's Upbringing Was Defined by Education and Hard Work............................ 2

    B.    John's Intellectual Curiosity, Creativity, and Service ........................................ 3

    C.    Timeline of John's Mental Health Issues.............................................................. 6

            1.    Individual Recognition of Mental Health Issues, Compliance with Treatment Plans, and Elimination of Antipsychotic Medications ............. 6

            2.    Incarceration at Metropolitan Detention Center, Brooklyn ...................... 7

    D.    John's Remarkable Road to Recovery.................................................................. 8

            1.    Forensic Psychiatric Evaluation and Bail Release to Inpatient Psychiatric Treatment........................................ 8

            2.    Zucker Hillside Hospital ............................................................................ 9

            3.    Memorial Hospital .................................................................................... 10

            4.    LifeSkills.................................................................................................. 11

III. CONSIDERATION OF THE PERTINENT POLICY STATEMENTS AND SENTENCING FACTORS WARRANTS A NON-CUSTODIAL SENTENCE............ 12

    A.    The Advisory Guidelines Calculation.................................................................. 13

    B.    Section 3553(a) Factors Justify a Non-Custodial Sentence................................. 13

            1.    Nature and Circumstances of the Offense; History and Characteristics of Mx. Lhota................................................ 14

            2.    Need for Sentence to Provide Specific and General Deterrence .............. 18

            3.    Need to Avoid Unwarranted Sentencing Disparities and Need to Provide Just Punishment for the Offense ................................... 20

            4.    Need to Provide Restitution to Victims .................................................... 24

IV. CONCLUSION........................................................................................................... 25

Page(s)

**Cases**

*Calderon v Bushwick Friendship LLC et al.*,
  Index No. 508049/2023 (Sup. Ct., Kings Cnty 2023) ...........................................24

*Gall v. United States*,
  552 U.S. 38 (2007)......................................................................................12, 18

*Glenn v. Quinones et al.*,
  Index No. 532736/2022 (Sup. Ct., Kings Cnty 2022) ...................................24

*Kimbrough v. United States*,
  552 U.S. 85 (2007)................................................................................................12

*Koon v. United States*,
  518 U.S. 81 (1996)................................................................................................22

*Pepper v. United States*,
  562 U.S. 476 (2011)......................................................................................12, 14

*Rita v. United States*,
  551 U.S. 338 (2007)......................................................................................12, 22

*United States v. Adelson*,
  441 F. Supp. 2d 506 (S.D.N.Y. 2006)..........................................................14

*United Stated v. Avilez*, No. 02-CR-999, 2005 U.S. Dist. LEXIS 14145
  (E.D.N.Y. July 12, 2005). ..........................................................................23

*United States v. Blake*,
  89 F. Supp. 2d 328 (E.D.N.Y. 2000) ....................................................21, 22

*United States v. Canova*,
  412 F.3d 331 (2d Cir. 2005)........................................................................18

*United States v. DiMattina*,
  885 F. Supp. 2d 572 (E.D.N.Y. 2012) .....................................................15, 18

*United States v. Fagundo*,
  No. 21-cr-195 (N.D. Ill. July 14, 2021), ECF Nos. 20, 23 ....................21

*United States v. Gomez*,
  No. 11-cr-96, 2013 WL 818717 (S.D.N.Y. Feb. 27, 2013) ....................18

*United States v. Guthrie*,
  No. 20-cr-541 (D.S.C. Apr. 8, 2021), ECF No. 31 .................................21

*United States v. K*,
  160 F. Supp. 2d 421 (E.D.N.Y. 2001) ......................................................24

*United States v. Munir*,
  953 F. Supp. 2d 470 (E.D.N.Y. 2013) ......................................................20

*United States v. Nesbeth*,
    188 F. Supp. 3d 179 (E.D.N.Y. 2016) ................................................18, 20

*United States v. Sanchez-Santa*,
    No. 20-cr-480 (S.D.N.Y. Feb. 1, 2021), ECF Nos. 1, 8, 13..................21

*United States v. Smith,*
    321 F. Supp. 3d 405 (E.D.N.Y. 2018) ....................................................22

*United States v. Smith,*
    945 F.3d 729 (2d Cir. 2019)....................................................................22

*United States v. Stewart*,
    590 F.3d 93 (2d Cir. 2009)......................................................................20

## Statutes & Rules

18 U.S.C. § 3553 ........................................................................... *passim*

18 U.S.C. § 842(i)(3) ....................................................................................1

U.S. SENTENCING GUIDELINES MANUAL § 2K1.3................................................13

U.S. SENTENCING GUIDELINES MANUAL § 2K1.4................................................13

U.S. SENTENCING GUIDELINES MANUAL § 2X1.1................................................13

U.S. SENTENCING GUIDELINES MANUAL § 3E1.1 .........................................13, 18

U.S. SENTENCING GUIDELINES MANUAL § 4A1.1................................................13

U.S. SENTENCING GUIDELINES MANUAL § 4A1.2................................................13

U.S. SENTENCING GUIDELINES MANUAL § 5H1.3..........................................22, 24

U.S. SENTENCING GUIDELINES MANUAL § 5K2.13..............................................22

## Other Authorities

Christie Thompson & Taylor Elizabeth Elridge, *Treatment Denied: The Mental Health Crisis in Federal Prisons*, THE MARSHALL PROJECT (Nov. 21, 2018, 6:00 AM), https://www.themarshallproject.org/2018/11/21/treatment-denied-the-mental-health-crisis-in-federal-prisons................................................24

*Mental Health By The Numbers*, NATIONAL ALLIANCE ON MENTAL ILLNESS (April 2023), https://www.nami.org/about-mental-illness/mental-health-by-the-numbers/#mental-illness-and-the-criminal-justice-system..........................24

Press Release, Department of Justice, *Brooklyn Man Arrested for Arson of Rash Nightclub* (April 14, 2022), https://www.justice.gov/usao-edny/pr/brooklyn-man-arrested-for-arson-rash-nightclub ...............................................20

U.S. Sentencing Commission, *2023 Sourcebook of Federal Sentencing Statistics* (2023), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2023/2023_Sourcebook.pdf...........................18

U.S. Sentencing Commission, *Recidivism of Federal Offenders Released in 2010*
(September 2021), https://www.ussc.gov/sites/default/files/pdf/research-and-
publications/research-publications/2021/20210930_Recidivism.pdf......................................19

This Sentencing Memorandum is respectfully submitted on behalf of Defendant John Shepard Lhota.[1]  On January 18, 2024, John pleaded guilty to one count of 18 U.S.C. § 842(i)(3). For the reasons set forth below, John respectfully requests that this Court impose a sentence consistent with the Probation Department's recommendation of time served plus two years of supervised release, with special conditions relating to mental health treatment, medication compliance, and substance abuse treatment, as the Court sees fit to impose.[2]

## I.    PRELIMINARY STATEMENT

As described in detail below, and in the many letters of support from their family and friends, John is a devoted child and caring friend who is exceptionally kind and committed to helping those around them.  Prior to the conduct that led to their conviction, aberrational as it was, John lived a modest life defined by their devotion to family, education, and hard work, and they earned the respect and trust of their friends and colleagues.  John was, and remains, a young individual defined by the character traits of generosity, compassion, creativity, and intelligence.

Sadly, John has struggled with mental health and substance abuse issues for years.  In or around January 2022, John's doctors took them off their prescribed antipsychotic medication, and as a result, the symptoms associated with their schizoaffective disorder—including audio and visual hallucinations—began to reappear.  Shortly thereafter, unfortunately, John engaged in the conduct underlying the instant offense.  Subsequently, on January 18, 2024, John pleaded guilty to one count of 18 U.S.C. § 842(i)(3).

Today, with the help of the Court, John is on a clear path towards stability, wellness, and sobriety.  Indeed, John has accepted responsibility for their conduct, they have expressed deep remorse, and they understand the gravity of the forthcoming sentencing proceedings.  In light of

---

[1] Hereinafter, "John" or "Mx. Lhota."  As John's preferred pronouns are they/them, those terms will be used herein.
[2] *See* U.S. Department of Probation, Sentencing Recommendation, at 1 (Aug. 1, 2024).

the numerous mitigating factors at issue in this case, as described in greater detail herein, and in accordance with recommendations set forth by the Probation Department and John's current treatment provider, the defense submits that a sentence of time served plus two years of supervised release, with any relevant special conditions that the Court sees fit to impose, is "sufficient, but not greater than necessary," to accomplish the sentencing objectives of 18 U.S.C. § 3553.

## II. JOHN LHOTA'S PERSONAL HISTORY AND CHARACTERISTICS

### A. John's Upbringing Was Defined by Education and Hard Work

John was born on September 24, 1997, in New York, New York, to John Francis Lhota and Emmy Omoto. (PSR ¶ 31).[3] Their father, John Francis Lhota, is a dentist, and maintains a dentistry practice in New York City, and their mother, Emmy Omoto, is a retired dentist. (*Id*. at ¶¶ 31, 86). Although John recalls that their parents' marriage was turbulent during their childhood, John currently maintains a good relationship with their parents, who have demonstrated unwavering support throughout this difficult period in John's life. (*Id*. at ¶ 31; Ex. 1 at 1-11).[4]

John attended Hunter College High School in New York City, where they excelled academically and avoided trouble. (PSR ¶ 82). Following high school, John attended Brown University in Providence, Rhode Island, where they received a Bachelor of Arts degree in computer science and visual arts. (*Id*.). After graduating from college in 2021, John interned at a software company named 410 Labs for a few months, until they were hired as a full-time software developer. John ultimately worked at 410 Labs until mid-April 2022, around the time of their arrest in this matter. (*Id*. at ¶ 87).

---

[3] Citations to "PSR" refer to the August 1, 2024 Presentence Report by the United States Department of Probation.
[4] John's many letters of support are attached hereto as Exhibit 1 ("Ex. 1").

**B.     John's Intellectual Curiosity, Creativity, and Service**

As demonstrated by the many letters of support submitted in connection with this sentencing submission, John is—and has always been—an attentive and caring individual, universally praised by those around them for their intellect, compassion, and service.  In the words of those who know them best, John was an exceptional student and a model citizen as a child and young adult, and their crime—which resulted from the failure of medical professionals to appropriately treat John's severe mental health issues—was completely inconsistent with their past behavior.  (Ex. 1 at 23-24).  Accordingly, in an effort to shine a light on John's true character, John's family, friends, co-workers, and ministers have recounted the ways in which John has positively impacted their lives, and they request that this Court craft a sentence that reflects mercy and justice.  (*Id*. at 38).

Initially, in a letter of support that is informative, caring, and introspective, John's father, John Francis Lhota, explains the ways in which John's academic and emotional intelligence, interest in learning, and work ethic has developed over the years.  From demonstrating empathy in their childhood school assignments to applying their knowledge in a manner meant to make the world a better place, John has not only cultivated a passion for academics, but also for the arts.  (*Id*. at 1-2).  Among John's many accomplishments, they achieved a perfect score on their SAT, they won a gold Scholastic writing award, they were named a National Merit Scholar, and they went on to attend and graduate from Brown University—with degrees in computer science and visual arts—while working part-time in the school's food service department, and as a teaching assistant.  (*Id.* at 2-3).

Beyond the words of John's father, those who have had an opportunity to work with John speak highly of John's diligence and creativity.  By way of example, John's former boss at 410 Labs notes that John—who had been hired as a junior software developer—was consistently on

time, attentive, and productive, and further, that John was a well-liked member of the team.  (*Id*. at 20).  Relatedly, John's high school friend, Daniel Glus, highlights John's genuine interest and aptitude in computer programming, citing a joint project on which he and John worked to encourage online collaboration.  (*Id*. at 18).  Additionally, referencing their weekend classes in advanced science and mathematics at Columbia University's Science Honors Program, Mr. Glus observes that John's approach to learning was, and is, inspirational to others.  (*Id*.).  Similarly, John's cousin, Keri Divanian, finds inspiration in John's desire to enrich the world around them, and she observes that John's immense talent and passion for the arts speaks to John's true character and serves as a testament to John's commitment to self-expression.  (*Id*. at 25).

On top of their intellect and creativity, John's thoughtfulness and compassion continually impress those around them.  Indeed—as set forth by one of John's former ministers, Leslie Merlin—intelligence, insight, positive engagement, and kindness are at the core of John's being.  (*Id*. at 28).  In one particularly salient example of John's true character, Jill Omoto, John's cousin, looks back on an instance in which John helped their maternal grandmother, who suffered from dementia, relocate to the memory unit in her assisted living facility.  (*Id*. at 12).  As noted by Jill Omoto, the relocation could have been stressful, but John's presence helped ease their grandmother's anxiety.  (*Id*.).  Equally impactful, John's uncle, Alan Lhota, recalls witnessing John's sense of humanity in action, specifically recounting John's understanding of, and patience with, his autistic son.  (*Id*. at 13).  And further, John's mother, Emmy Omoto, recounts John's commitment to showing up for their family, noting an occasion in which John traveled by train and car from Providence, Rhode Island to Long Island, New York and back—in one day—so that John could be there for their paternal grandmother on her 80th birthday.  (*Id*. at 8-9).

Notably, John's compassion is not limited to those who are close to them. Indeed, John's commitment to community service through various acts of charity is a common theme running through several letters of support. For example, Tatiana Gammichia, a family friend, recalls countless memories of John volunteering alongside their mother, helping others and making a positive difference in the lives of those around them. (*Id*. at 30). Echoing this sentiment, several family members and friends of the family, including John's parents, Alan Lhota, Tamara Holliday, and Anneline Viviano, remember instances in which John uniquely refrained from asking others for traditional birthday or holiday gifts and instead asked those individuals to donate money to charity. (*Id*. at 13, 16, 32). Additionally, while John was in high school, they volunteered in a soup kitchen, helped their classmates in a weekly writing workshop, and tutored math at a middle school in lower Manhattan. (*Id.* at 16). And once they started studying at Brown University, they volunteered their time and effort to multiple charitable organizations, including: (i) ACOS (AIDS Care Ocean State), a needle exchange and HIV/AIDS testing organization; (ii) HOPE (Homeless Opportunities for People Everywhere), a homeless outreach organization; and (iii) ARMS, an organization dedicated to using art to reduce mental health stigma. (*Id.*)

Notably, however, and despite John's unmistakable intellect, strong work ethic, commitment to family and friends, and dedication to helping those in need, John has struggled with substance abuse and mental health issues of their own. Notwithstanding these struggles, John has a demonstrated history—pre-dating the incident underlying this case—of recognizing the existence of these issues, proactively seeking support and treatment to address them, and diligently taking medications that have been prescribed by medical professionals. Unfortunately, however, the relevant conduct at issue here followed closely on the heels of a doctor's fateful decision to take John off their antipsychotic medications.

C.    **Timeline of John's Mental Health Issues**

1.    **Individual Recognition of Mental Health Issues, Compliance with Treatment Plans, and Elimination of Antipsychotic Medications**

As noted above, John grew up in New York City and attended grade school in Manhattan before being admitted to Hunter College High School.  During high school, John experienced intense anxiety, depression, and paranoia, though they continued to do well academically, and they began attending Brown University in the Fall of 2016.  Shortly after going to college, John sought mental health treatment and therapy.  From in or about February 2017 to in or about January 2020, John saw several mental health professionals who treated John's developing symptoms of psychosis, depression, and anxiety with various antipsychotic, antidepressant, and antianxiety medications.  During this period, John actively communicated with their doctors regarding the medications that they were taking, and they ultimately graduated from Brown University in or around May 2021.

Despite taking the above-referenced medications, John's symptoms of psychosis worsened over time to include alternating periods of depression and mania, as well as auditory hallucinations.  As a result of these symptoms, John was psychiatrically hospitalized for the first time from approximately January 12, 2021 to January 21, 2021.  Upon discharge, John was diagnosed with schizophreniform disorder and prescribed Risperdal, an antipsychotic medication.  Over the next year, however, John's doctors mistakenly tapered their Risperdal dosage, and ultimately, they took John off Risperdal entirely.   The timeline of prescription tapering—under their doctor's supervision—was as follows:

- On or about January 21, 2021, John was prescribed 6mg of Risperdal.
- In February 2021, John's Risperdal dosage was decreased from 6mg to 4mg.
- In June 2021, John's Risperdal dosage was decreased from 4mg to 3mg.
- In August 2021, John's Risperdal dosage was decreased from 3mg to 2.5mg.

- In October 2021, John's Risperdal dosage was decreased to 1.5mg.
- In December 2021, John's Risperdal dosage was decreased to 0.5mg.
- In January 2022, John's Risperdal prescription was discontinued.

During the above-referenced time frame—from January 2021 to January 2022—John diligently took their prescribed Risperdal medication without incident. After John's Risperdal prescription was discontinued, however, they again began to experience paranoid delusions, anxiety, depression, and suicidal ideations. Sadly, shortly after John's medications were discontinued by their treating psychiatrist, they began experiencing these symptoms again, and they committed the instant offense.

### 2. Incarceration at Metropolitan Detention Center, Brooklyn

On or about April 14, 2022, John was arrested and charged by the United States Attorney's Office, and they appeared before United States Magistrate Judge Roanne L. Mann for their initial appearance. During said appearance, Judge Mann ordered that John be remanded without prejudice. John was then incarcerated at Metropolitan Detention Center, Brooklyn ("MDC Brooklyn") for approximately six months.

While incarcerated at MDC Brooklyn, John experienced horrific treatment. Among other issues, John submitted several requests to see a doctor so that they could discuss their mental health concerns and request medication to alleviate certain psychotic symptoms that they had been experiencing. John's requests, however, went unanswered, and as a result, John was not provided with the medication that they so desperately needed. Later, John's glasses broke, and they submitted several requests for a new pair, but all their requests went unanswered.

Additionally, while John was incarcerated at MDC Brooklyn, they were housed at the MDC's Special Housing Unit, where they were the victim of a physical assault and an attempted sexual assault. As a result of the physical assault, John believed that their nose was broken and

healed out of place. John submitted several requests to see a doctor to address this issue and their requests went unanswered. Separately, as a result of the attempted sexual assault, MDC Brooklyn staff moved the perpetrator to another cell block, but they did not provide John with follow-up services to address the trauma associated with the event. Subsequently, on or about June 12, 2022, John tried to commit suicide by cutting their wrists with a wire from a disposable surgical mask.

Following John's attempted suicide, John was taken to MDC Brooklyn's health services clinic, where they were diagnosed with schizophrenia, anxiety disorder, and major depressive disorder. John was prescribed 0.5mg of Risperidone, the lowest dosage they were prescribed before they were taken off of all antipsychotic medications in early 2022. In the aftermath of this trip to the health services clinic, John's additional requests to see a medical professional—to obtain glasses, to obtain treatment for their injured nose, to obtain mental health services, and to obtain the correct dosage of their antipsychotic medications—were ignored.

### D. John's Remarkable Road to Recovery

#### 1. Forensic Psychiatric Evaluation and Bail Release to Inpatient Psychiatric Treatment

While Mx. Lhota remained incarcerated at MDC Brooklyn, and unable to see medical professionals, the undersigned counsel retained Dr. Alexander Bardey to: (i) perform a forensic psychiatric evaluation on John; (ii) develop a more comprehensive understanding of John's diagnoses; and (iii) set forth treatment recommendations based on John's psychological/psychiatric functioning.[5] Dr. Bardey subsequently met with John on multiple

---

[5] Dr. Bardey is a board-certified Forensic Psychiatrist in New York City. After graduating from Harvard College, he attended medical school at Stony Brook University. He then completed a four-year residency program in Psychiatry at NYU Medical Center, where he later became the Deputy Director of Forensic Psychology. Dr. Bardey went on to become the Director of the Kendra's Law program in Manhattan, and later, the Director of Mental Health at Rikers Island. He currently holds teaching positions on the faculty of NYU Medical Center and New York Medical College. *See Alexander Sasha Bardey, MD*, FIFTH AVENUE FORENSICS (2024), https://fifthavenueforensics.com/about/experts/alexander-sasha-bardey-md/. Dr. Bardey's Forensic Psychiatric Evaluation is appended to Dr. Daniel Bober's letter, which is attached to this Memorandum as Exhibit 2 ("Ex. 2").

occasions and reviewed medical records from several of John's prior mental health providers, as well as the Bureau of Prisons. As a result of these efforts, Dr. Bardey diagnosed John with: Schizoaffective Disorder, Bipolar Type; Generalized Anxiety Disorder; and Alcohol, Cannabis and Stimulant Use Disorders. Further, Dr. Bardey indicated that John would greatly benefit from admission to an inpatient psychiatric unit to: (i) stabilize their psychotic and mood symptoms psychopharmacologically; (ii) ensure their safety; and (iii) reduce the likelihood of future psychiatric decompensation.

On or about September 21, 2022, after receiving the above-noted diagnosis and recommendation from Dr. Bardey, the undersigned counsel requested John's release from custody and admission into an inpatient psychiatric facility for a more comprehensive mental health evaluation, diagnostics and treatment, and titration of medication. On October 12, 2022, after six months of incarceration, Magistrate Judge Robert Levy ordered John's release from MDC Brooklyn to Northwell Health's Zucker Hillside Hospital, located in Queens, New York, for mandatory inpatient psychiatric treatment.

### 2. Zucker Hillside Hospital

On or about October 12, 2022, John was transferred from MDC Brooklyn to Zucker Hillside Hospital, where they received inpatient psychiatric services and treatment. In addition to individual and group counseling, including cognitive behavioral therapy, John was amenable to, and fully complied with, the Hospital's efforts to implement a prescription medication regimen tailored to John's needs. During their period of treatment at Zucker Hillside, John actively took several medications—including but not limited to Haloperidol, Lorazepam, Lithium, and Risperidone—designed to address, among other things, symptoms associated with Schizoaffective Disorder and Generalized Anxiety Disorder.

Through their cooperation, noted by their willingness to accept and engage in a rigorous treatment plan, John made significant strides on their path to stability and wellness. For example, at the outset of their time spent at Zucker Hillside, John continued to experience audio/visual hallucinations. But after weeks of individualized treatment, as well as the consistent administration of necessary antipsychotic medication, Hospital personnel indicated that said treatment plan reduced John's overt symptoms of mania, psychosis, and depression. In conjunction with these preliminarily positive steps, as Zucker Hillside had successfully titrated John's medications to effective dosages, staff recommended that John continue to receive treatment furnished in an alternative inpatient psychiatric facility.

### 3.    Memorial Hospital

On or about November 8, 2022, in line with Zucker Hillside's above-noted recommendation, Magistrate Judge Levy granted the defense's request to allow John to continue receiving inpatient psychiatric treatment at Memorial Hospital in Hollywood, Florida, under the care and supervision of Dr. Daniel Bober.[6] Among the conditions of release, Judge Levy ordered John to wear a GPS electronic monitoring ankle bracelet.[7] On or about the same day, John was transferred from Zucker Hillside to Memorial Hospital, where their medications were adjusted in an effort to develop a long-term individualized medication regimen to address their specific psychiatric needs. Notably, John's Risperdol dosage was tapered, and at the same time, they began taking Clozapine (an alternative antipsychotic medication) and Depakote (a mood stabilizing

---

[6] *See* Ex. 2. Dr. Bober is John's current psychiatrist and treatment provider. Dr. Bober graduated from Michigan State University, where he became a licensed Doctor of Osteopathic Medicine. Following the completion of his General Psychiatry Residency at Yale New Haven Hospital, he completed a Child and Adolescent Psychiatry Fellowship at Yale Child Study Center and a Forensic Psychiatry Fellowship at University of Massachusetts Medical School. Currently, in addition to operating his own practice, Dr. Bober is the Chief of the Department of Psychiatry in the Memorial Regional Healthcare System, as well as the Medical Director of Lifeskills South Florida.

[7] John has worn the GPS bracelet without incident since November 2022.

medication), among other medications. Over the course of approximately one month, John successfully engaged in treatment, allowing their medications to reach target therapeutic levels.

Upon John's completion of the inpatient treatment program at Memorial Hospital, Dr. Bober recommended that John be transferred to the LifeSkills South Florida residential treatment program ("LifeSkills"), where Dr. Bober is the current Medical Director. This transition, which as noted below was granted by Magistrate Judge Levy, not only allowed Dr. Bober to continue to oversee John's treatment, but also critically provided John with a sense of consistency on their path to recovery.

### 4. LifeSkills

On or about December 14, 2022, following Dr. Bober's above-noted recommendation, Magistrate Judge Levy granted the defense's request to transfer John from Memorial Hospital to LifeSkills—a mental health residential treatment center, located in Deerfield Beach, Florida, offering various programs to treat, *inter alia*, schizoaffective disorder, psychosis, and other mental health needs. Between December 14, 2022 and today, with permission from the Court, John has participated in three separate treatment programs, stepping down from round-the-clock residential treatment to outpatient services designed to foster independence while continuing to support individuals on their path to recovery. Notably, John participated in, and successfully completed: (i) LifeSkills' Residential Treatment Program, where they remained from December 14, 2022 to June 14, 2023 (183 days); and (ii) LifeSkills' Partial Hospitalization Program, where they remained from June 14, 2023 to September 27, 2023 (106 days). Since September 27, 2023, John has participated in LifeSkills' Intensive Outpatient Program, attending individual and group therapy sessions, following their treatment plan, and living a drug-free lifestyle.

Without reservation, the defense is pleased to report that John has thrived during their treatment at LifeSkills. Critically, John has been compliant in taking their medications, they have

been sober for over two years, and they have shown significant improvement in their mental health and overall wellbeing.  As indicated by their LifeSkills clinicians, John has actively and willingly participated in therapeutic groups, they have demonstrated significant improvement in their daily living activities, and they continue to follow all clinical recommendations.  With the permission of the Court, John has taken several steps towards achieving the self-awareness, self-reliance, and self-monitoring skills that are necessary to live an independent life outside of treatment.

John has also dedicated a significant amount of time to, and completed over 450 hours of community service with, Habitat for Humanity of Greater Palm Beach County.  (Ex. 1 at 40).  In addition, John has been participating in SMART Recovery Addiction Support meetings.  (PSR ¶ 80).  As has been the case with all prior changes to their bail conditions, Mx. Lhota has continued to comply—to this day—with all their conditions of release.

## III. CONSIDERATION OF THE PERTINENT POLICY STATEMENTS AND SENTENCING FACTORS WARRANTS A NON-CUSTODIAL SENTENCE

One of the fundamental principles underlying the federal sentencing statute is that courts must impose a sentence that is "sufficient, but not greater than necessary," to accomplish the sentencing objectives of 18 U.S.C. § 3553(a)(2).  As this Court is aware, however, the Guidelines are advisory in nature and simply serve as the "starting point and the initial benchmark" in calculating a sentence.[8]  Consequently, the Court "may not presume that the Guidelines range is reasonable"[9] and should instead exercise discretion in fitting a sentence to a defendant's individual circumstances, duly considering fairness and justice under all the circumstances.[10]

---

[8] *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (internal quotation marks and citation omitted).
[9] *Gall v. United States*, 552 U.S. 38, 50 (2007)
[10] *See Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (recognizing "the principle that the punishment should fit the offender and not merely the crime"); s*ee also Rita v. United States*, 551 U.S. 338, 351 (2007) ("[The sentencing judge] may hear arguments … that the Guidelines sentence should not apply, perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply … perhaps because the Guidelines sentence itself fails to properly reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless.").

## A. The Advisory Guidelines Calculation

As set forth in John's plea agreement, the government estimates John's offense level to be 24,[11] and it credits John with a three-level reduction for acceptance of responsibility,[12] resulting in an adjusted offense level of 21. Pursuant to this calculation, a total offense level of 21, combined with zero criminal history points,[13] yields an Advisory Guidelines range of 37 – 46 months' imprisonment.[14] As discussed below, however, the unique circumstances of this case warrant adopting the Probation Department's recommendation for a non-custodial sentence of time served plus two years of supervised release, with special conditions relating to mental health treatment, medication compliance, and substance abuse treatment.

## B. Section 3553(a) Factors Justify a Non-Custodial Sentence

Pursuant to 18 U.S.C. § 3553(a), the Court must consider: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the kinds of sentences available; (iii) the applicable Guidelines range; (iv) any pertinent policy statement; (v) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (vi) the need to provide restitution to victims of the offense. The statute further specifies that the Court must consider the need for the sentence imposed: (A) to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with, among other things, needed medical care in the most effective manner.[15]

---

[11] See U.S. SENTENCING GUIDELINES MANUAL §§ 2K1.3(c)(1)(A), 2X1.1(a), and 2K1.4(a)(1) (2023).
[12] See id. at § 3E1.1(b).
[13] See id. at §§ 4A1.1 and 4A1.2(c).
[14] See id. at Ch. 5, Pt. A.
[15] 18 U.S.C. § 3553(a)(2).

1.      **Nature and Circumstances of the Offense;**
        **History and Characteristics of Mx. Lhota**

John understands the seriousness of the instant offense and they have been remorseful throughout the pendency of this case.  With the benefit of intensive inpatient and outpatient mental health and drug treatment, as well as life-saving medications, they have accepted responsibility for their conduct, and they recognize the gravity of the upcoming sentencing proceedings.[16]  Without minimizing the relevant conduct, the defense additionally and respectfully submits that the unique facts and circumstances underlying the instant offense remove this matter from the heartland of typical cases falling within the ambit of the relevant sentencing guidelines.  Indeed, as set forth by the Probation Department in its sentencing recommendation, around the time of the instant offense: (i) John was struggling with one of the most serious mental health issues imaginable; (ii) they were seeing a doctor to address those issues; and (iii) had their doctor not taken them off their prescribed medication, the instant offense may never have occurred.[17]

While the confluence of the above-noted factors alone might justify the Probation Department's sentencing recommendation of time served with supervised release, additional consideration of John's personal characteristics, including but not limited to their monumental efforts to undergo rehabilitation and treatment, further supports a non-custodial sentence in this matter.[18]  Without question, when looking beyond the discrete window of time in which John's doctor took them off of their antipsychotic medication, John has demonstrated extraordinary intellect, creativity, and devotion to others at every stage of their life.  Indeed, those closest to John

---

[16] *See* Ex. 1 at 15 ("[I]n speaking with [John], I sense their honest remorse.").

[17] *See* U.S. Department of Probation, Sentencing Recommendation, at 3 (Aug. 1, 2024) ("It appears that the defendant would benefit more from therapeutic assistance, rather than a punitive punishment.").

[18] *See United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) ("[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance."); *see also Pepper*, 562 U.S. at 488 (noting that sentencing courts should consider the "widest possible breadth of information about a defendant" to ensure that the sentence imposed suits the individual defendant).

14

have admired them for: (i) excelling inside and outside of the classroom; (ii) adding value in the workplace; (iii) stepping up for family; (iv) contributing to charitable organizations; and (v) lending a hand to those in need.[19]

Quite plainly, the attached letters of support—which paint the portrait of a caring and thoughtful young individual, recognized by those around them as intelligent, compassionate, patient, gentle, and kind—serve as a helpful backdrop to highlight the "ravages of mental illness," (Ex. 1 at 28), and perhaps more importantly, the effectiveness of medication for many people who suffer from significant mental illnesses. Indeed, before John's doctors took them off their antipsychotic medications in January 2022, John lived a relatively normal life—attending, and graduating from, Brown University; moving back to their hometown of New York City; and working a full-time job—while obeying the law. But in or around January 2022, without the stabilizing benefit of their previously prescribed antipsychotic medications, John's mental illness took over, and it took everything away from them: a job they enjoyed, relationships with their family and friends, their reputation, and the goodwill that they have garnered throughout their life. Simply put, John's mental illness—aptly described by Ms. Merlin as an "invisible disability," (*id.*)—has been devastating, and it has wreaked havoc on the lives of many, including the victims in this case. In the face of such a devastating life event, however, John remains dedicated to rebuilding their life and positively contributing to society.

With the help of the Court, John has taken several positive steps in furtherance of managing their mental illness. Today, while recognizing that there is still work to be done, John has maintained full compliance with their doctors' treatment plans, they have maintained their sobriety for two-and-a-half years, and they have continued their difficult journey towards returning to the

---

[19] *See, e.g., United States v. DiMattina*, 885 F. Supp. 2d 572, 582 (E.D.N.Y. 2012) (support letters attesting to defendant's "good character and many acts of charity" justified reduction).

rational, thoughtful, and caring person that their family and friends have always known. Among the various letters of support appended to this document, several stand out as noteworthy, particularly in their recent observations of John's improvement:

- "As someone who has known John all their life, my observations are that **John is dramatically improved in terms of symptoms and behavior**, and equally important, John has returned to the kind, compassionate behavior as a person that I have always seen in them, up until they first experienced symptoms of a serious mental illness." (Ex. 1 at 5).

- "In recent months, my husband and I both feel that **we can again see the John that we remember before the advent of the mental illness**. John has been more relaxed and furthermore has developed greater insight about their mental illness and mental health, and John has been thinking much more clearly since they have been in treatment and since they have been taking the clozapine." (*Id*. at 10).

- "I spoke to John last week, and their thought processes were absolutely clear, their insight and judgment completely intact, and **they sounded like the young person I had known before their illness**. John understands that this is a lifelong illness and that they will need to be in treatment, on medication, and sober, in order to function." (*Id*. at 22).

- "[John] told me that **they're keenly aware of needing to be on medication for the rest of their life**, and that they know that getting off of them can have disastrous consequences." (*Id*. at 36).

- "In a recent conversation **John sounded upbeat and optimistic and I believe has benefitted greatly from therapy**." (*Id*. at 17).

John has suffered from, but will not be defined by, substance abuse and mental health issues. And critically, as emphasized by several people who wrote letters of support, John has an excellent support structure that will be there for them as they move beyond the criminal justice system and towards a healthy, productive lifestyle:

- "**I will support John in any and every way possible** to solidify and maintain their recovery." (Ex. 1 at 6).

- "My husband and I have educated ourselves about mental illness to better understand John's situation …. **We are committed to doing whatever we**

can to help John maintain their mental health and grow, and furthermore, John has a good network of other people to support them." (*Id*. at 11).

- "Thankfully, John is fortunate to have a supportive and loving family. **John's parents and extended family will remain by their side** as they continue to work towards rebuilding their life post-treatment." (*Id*. at 25).

- "Please also keep in mind that **[John has] a great support system of family and friends** who want the best for them and will help them along this difficult journey." (*Id*. at 38).

- "**John has parents who are very loving and supportive**, educated about severe mental illness, and have the resources to provide John with the best psychiatric care." (*Id*. at 22).

- "John has received excellent treatment, is medicated in a way that allows good functioning, and **John can count on their loving and supportive family** …. I am also aware that **they have a strong community, including the congregation of Second Presbyterian Church, which stands in support of them all**." (*Id*. at 28).

With the help and support of their family and friends, John has not only demonstrated a willingness to engage in substantive rehabilitative efforts, but they have also demonstrated how those within the criminal justice system can successfully confront and manage significant substance abuse and mental health issues when given the chance.

On top of John's remarkable efforts to participate fully in their treatment plans, John has volunteered hundreds of hours at Habitat for Humanity (Ex. 1 at 40) and taken online college-level courses in mathematics (*Id*. at 10). Additionally, John has applied to various graduate programs in mathematics, and they have been accepted into programs offered by Johns Hopkins University, SUNY Stony Brook, Hunter College, and the University of Minnesota. (*Id*.). John is currently taking an upper-level calculus prerequisite, and they are eligible to begin Johns Hopkins' online graduation program in mathematics in January 2025.

Without question, John's future is bright, and the defense respectfully submits that, in light of several relevant circumstances, including but not limited to: (i) John's otherwise exemplary and law-abiding life[20]; (ii) John's family ties[21]; (iii) John's young age (24 at the time of the offense)[22]; (iv) John's charitable actions and good character[23]; (v) John's good conduct and cooperation with this Court since being released from custody in October 2022[24]; (vi) John's acceptance of responsibility[25]; and (vii) the significant mitigating circumstances surrounding John's mental health and substance abuse issues—as well as their recent, and herculean, efforts at rehabilitation—a below-Guidelines, non-custodial sentence is appropriate and justified.[26]

### 2. Need for Sentence to Provide Specific and General Deterrence

The Court should take into consideration the need "to protect the public from further crimes of the defendant," which is often viewed as the need to provide specific deterrence. Respectfully, John does not pose a threat of recidivism and there is no doubt that John has already felt significant punishment as a result of their conduct. Indeed, they spent over two years enduring the stress of the prosecution. They lost their job. They lost friends. And they spent approximately six months incarcerated at the MDC, under severe conditions of confinement, where: (i) they were the victim of an assault and attempted sexual assault; (ii) they were denied medical treatment and eyeglasses;

---

[20] *See, e.g., United States v. Nesbeth*, 188 F. Supp. 3d 179, 193-94 (E.D.N.Y. 2016) (downward variance warranted in part because defendant's narcotics-related crimes were a marked deviation from an exemplary law-abiding life, defendant had worked in meaningful jobs, and defendant had a prior record of good works).

[21] U.S. Sentencing Commission, *2023 Sourcebook of Federal Sentencing Statistics*, at Table 44 (2023), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2023/2023_Sourcebook.pdf (citing family ties as a reason for downward variances).

[22] *See, e.g., See United States v. Gomez*, No. 11-cr-96 (RWS), 2013 WL 818717, at *6 (S.D.N.Y. Feb. 27, 2013) (finding that defendant's young age (31) was significant factor in justifying the court's departure from the Guidelines).

[23] *See, e.g., DiMattina*, 885 F. Supp. 2d at 582 (support letters attesting to defendant's "good character and many acts of charity" justified reduction); *see also United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (affirming downward departure based on extraordinary public service and good works).

[24] PSR at ¶¶ 60-65.

[25] *See* U.S. SENTENCING GUIDELINES MANUAL § 3E1.1(b) (2023).

[26] *See* U.S. Department of Probation, Sentencing Recommendation, at 1 (Aug. 1, 2024); *see generally Gall*, 552 U.S. at 44, 48, n.4 (supervised release "is not merely letting an offender off easily" but rather involves a "substantial restriction of freedom" that deters and punishes (citations and quotation omitted)).

(iii) they were denied access to sufficient mental health services and adequate antipsychotic medication; (iv) much of the incarceration was in solitary confinement; and (v) they tried to commit suicide.

These consequences, coupled with the immense personal shame resulting from their arrest and subsequent conviction, as well as subsequent treatment and medication, all but ensure specific deterrence from committing any further crimes, and thus, a sentence of time served plus two years of supervised release, with special conditions, is sufficient. To be sure, publications by the U.S. Sentencing Commission confirm that offenders with zero criminal history points, like John, have the lowest rates of recidivism, as compared to those with one or more criminal history points.[27] Moreover, college graduates, like John, have the lowest rates of recidivism, compared to those with lower levels of education.[28] And significantly, offenders sentenced to custodial terms of less than six months have the lowest rates of rearrest, compared to those sentenced to lengthier terms of imprisonment.[29]

Separately, section 3553(a)(2)(C) requires the Court to take into consideration the need "to afford adequate deterrence to criminal conduct," which is often viewed as the need to provide general deterrence. In light of the unique circumstances underlying this case, no term of imprisonment—beyond that which has already been served—will advance this need. Indeed, the punishment that John has endured thus far is more than sufficient to deter others from engaging in similar conduct. Not only has John already been subjected to a deprivation of liberty, but their reputation has been irreparably damaged and their prospects of obtaining future employment have

---

[27] U.S. Sentencing Commission, *Recidivism of Federal Offenders Released in 2010*, at 26-27 (September 2021), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf.

[28] *Id.* at 31.

[29] *Id.* at 35.

been significantly curtailed.[30]  Further, the defense notes that many major news outlets, from *The New York Times* to *The Guardian*, along with several local news outlets, reported on this case with interest.   Coupled  with  the  government's  own  statements,[31]  the  external  public  messaging surrounding the incident underlying this case has surely extinguished any hypothetical inclination of the general public to engage in similar conduct.[32]  In sum, it is hard to imagine that anyone would want to risk landing in John's shoes.  Indeed, John's story illustrates that the best deterrence to the instant criminal conduct is timely and appropriate mental health treatment, and hopefully this message resonates with others who find themselves in similar desperate situations such as John's.  Uniquely, this case could very well exemplify an oft-eluded goal of the federal criminal justice system – a successful intervention with a troubled mentally ill defendant. Thus, the defense respectfully submits that the goals of specific and general deterrence have already been achieved and that additional prison time would not advance those goals.

### 3. Need to Avoid Unwarranted Sentencing Disparities and Need to Provide Just Punishment for the Offense

As  noted  above,  the  unique  circumstances  underlying  the  instant  offense—including John's history of significant mental health issues, drug abuse, and substantial rehabilitation— remove this matter from the heartland of cases to which the U.S. Sentencing Commission intended the relevant Guidelines to apply.   Nonetheless, while no two cases are identical in every respect, the defense notes that various cases involving, *inter alia*, arson-related offenses, other violent offenses resulting in physical injury, and/or mental health and substance abuse issues, provide a

---

[30] *See, e.g., United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("[T]he need for further deterrence … is lessened because the conviction itself 'already visits substantial punishment on the defendant.'"); *see also  Nesbeth*, 188 F. Supp. at 179 (sentencing defendant convicted of narcotics-related offenses to one year of probation in part because of the collateral consequences associated with the conviction).

[31] Press Release, Department of Justice, *Brooklyn Man Arrested for Arson of Rash Nightclub* (April 14, 2022), https://www.justice.gov/usao-edny/pr/brooklyn-man-arrested-arson-rash-nightclub.

[32] *See, e.g., United States v. Munir*, 953 F. Supp. 2d 470, 475 (E.D.N.Y. 2013) (recognizing that "[p]ublicity will probably add to the taint of a conviction even after a defendant has served his sentence").

useful measure of guidance. For example, in *United States v. Guthrie*, where the defendant was convicted of 18 U.S.C. § 231 for assisting in the arson of a police car, the district court sentenced the defendant to time served plus one year of supervised release.[33]

In addition to the above-cited examples, the defense notes that being convicted of a violent crime in this district does not automatically trigger a sentence that includes a period of incarceration, and judges frequently consider a defendant's history of mental illness and drug addiction when crafting sentences to reflect the seriousness of the relevant offense, promote respect for the law, and provide just punishment. For example, in *United States v. Blake*, the defendant pleaded guilty to 18 U.S.C. § 2113(a) and 18 U.S.C. § 2113(d), after stabbing a teller during a bank robbery and causing the teller to suffer from severe and permanent physical and psychological injury.[34] Although the defendant's Guidelines range was 87 – 108 months, the court granted a downward departure from level 29 to level 8 and sentenced the defendant to time served plus supervised release, in part because the defendant's crime was aberrant and committed while she was suffering from a serious psychological disorder (major depression and mixed personality traits with borderline and dependent features), and in part because the defendant took significant steps to rehabilitate herself and make amends for her crime.[35] In imposing the below-Guidelines sentence, the court carefully concluded that "strict controls outside of prison [would] be more beneficial not only for [the defendant's] rehabilitation but also for society."[36]

---

[33] *See United States v. Guthrie*, No. 20-cr-541 (D.S.C. Apr. 8, 2021), ECF No. 31; *see also United States v. Fagundo*, No. 21-cr-195 (N.D. Ill. July 14, 2021), ECF Nos. 20, 23 (where defendant was convicted of 18 U.S.C. § 231 for setting fire to police car, district court sentenced defendant to three years' probation); *United States v. Sanchez-Santa*, No. 20-cr-480 (VSB) (S.D.N.Y. Feb. 1, 2021), ECF Nos. 1, 8, 13 (where defendant was indicted on one count of 18 U.S.C. § 844(f)(1)-(2) for attempting to set fire to police car, district court approved a deferred prosecution agreement).
[34] *United States v. Blake,* 89 F. Supp. 2d 328, 331-32 (E.D.N.Y. 2000).
[35] *Id*. at 332-34, 353.
[36] *Id*. at 347 ("While on supervised release, the ties of community and family can help integrate the defendant into a healthy respect for the law and an understanding of the responsibilities of adulthood… This knowledge enhances the probability of a law-abiding life, of contributions to society in the form of taxes and otherwise, and of a substantial

Should it so choose, this Court, like the *Blake* court, could depart downward based on several potentially relevant policy statements and/or otherwise relevant mitigating factors relating to John's mental and emotion condition,[37] diminished capacity,[38] and/or significant pre-sentence rehabilitation.[39]  Indeed, as this Court is aware, the Guidelines "place essentially no limit on the number of potential factors that may warrant a departure,"[40] which may be justified where, as here, the offense or offender is "atypical," and thus, does not fall within the "mine-run" of similar cases.[41]  Notably, however, even if this Court declined to apply a downward departure in this matter, consideration of the relevant 3553(a) factors supports a non-Guidelines, non-custodial sentence under the post-*Booker* regime.

In another case, *United States v. Smith*, the defendant pleaded guilty to 22 U.S.C. § 2778(b)(2) and 22 U.S.C. § 2778(c), after attempting to export illegally from the United States to Turkey certain firearm components.[42]  Although the defendant's guidelines range was 51 – 63 months, the court sentenced the defendant to two months' incarceration followed by six months of supervised release.[43]  In support of its sentencing determination, the court properly considered, among other things: (i) the serious nature of the crime; (ii) the unique circumstances underlying the commission of the crime, including the defendant's aberrational conduct and drug addiction; (iii) the need for drug treatment; and (iv) the probable consequences of imposing a longer term of incarceration.[44]

---

reduction in the cost to taxpayers whose expenditures for incarceration are many times larger than for strict supervised release.").
[37] *See* U.S. SENTENCING GUIDELINES MANUAL § 5H1.3 (2023).
[38] *See id*. at § 5K2.13.
[39] *Blake,* 89 F. Supp. 2d at 339-40 ("Power to depart may be based upon significant pre-sentence rehabilitation and the probability of continuing steps toward permanent good behavior.").
[40] *Koon v. United States*, 518 U.S. 81, 106 (1996) (citation omitted).
[41] *Rita*, 551 U.S. at 344, 351.
[42] *United States v. Smith*, 321 F. Supp. 3d 405, 407 (E.D.N.Y. 2018), *aff'd,* 945 F.3d 729 (2d Cir. 2019).
[43] *Id*. at 406-09.
[44] *Id*.

This Court has also had the opportunity to consider significant mental impairments and the collateral consequences of criminal convictions in the context of sentencing determinations. In *United States v. Avilez*, for example, despite determining that the defendant's Guidelines range was 46 – 57 months, this Court imposed a non-Guidelines sentence of three years' probation with one year of community confinement and participation in a mental-health treatment program.[45] In determining the sentence, the Court thoughtfully considered, among other things: (i) the seriousness of the narcotics-related offense; (ii) its observations of the defendant's appearance during the initial sentencing proceeding; (iii) a medical recommendation that the defendant receive comprehensive rehabilitative therapy rather than incarceration; and (iv) the defendant's significant compliance with presentence reporting requirements.[46] Additionally, citing 18 U.S.C. § 3553(a)(2)(D), the Court appropriately concluded that its sentencing determination was best guided by the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."[47]

In outlining the above-noted case law, the defense does not seek to excuse John's conduct. Rather, the defense respectfully submits that the law supports an individualized assessment of the significant mitigating circumstances in this matter and justifies the imposition of a non-incarceratory sentence. Similar to the mitigating circumstances cited in *Blake*, *Smith*, and *Avilez*, John's conduct here was not only aberrant but committed while suffering from a serious mental illness and drug addiction. And like those defendants, who received minimal or non-custodial sentences, John has complied fully with the conditions of their release, and they have taken significant steps towards rehabilitation. Moreover, pursuant to U.S. Sentencing Guidelines

---

[45] *United States v. Avilez,* No. 02-CR-999 (FB), 2005 U.S. Dist. LEXIS 14145, at *1, 9-10, 18 (E.D.N.Y. July 12, 2005).
[46] *Id*. at *11-19.
[47] *Id*. at *16-17 (internal quotation marks omitted).

Manual § 5H1.3 and 18 U.S.C. § 3553(a)(2)(D), and particularly relevant as this Court considers the imposition of sentence, the defense notes that continued treatment is medically necessary at this stage of John's rehabilitation and recovery.[48]  Beyond the fact that any additional period of incarceration would interrupt and risk undermining John's current treatment plan, Dr. Bober notes that use of the medication Clozapine requires monthly blood tests to monitor their medication levels and protect against the onset of potentially serious side effects.[49]  Given the circumstances under which John remained incarcerated at the outset of this matter, the defense respectfully submits that the Bureau of Prisons is not equipped to manage John's future medical care effectively.[50]

### 4.    Need to Provide Restitution to Victims

Finally, the two victims in this case named John as a defendant in separate civil actions stemming from the same underlying conduct.[51]  To date, one matter has been settled with a payment to the victim of $65,000.00 (with financial assistance from John's parents), and one matter is pending, though the defense has been communicating with plaintiff's counsel in an effort to resolve that case as well.

---

[48] *See United States v. K*, 160 F. Supp. 2d 421, 423 (E.D.N.Y. 2001) ("Saving rather than destroying defendants is permitted under the Guidelines.")

[49] *See* Ex. 2 at 2 (citing "several potentially serious side effects, including agranulocytosis (lowered white blood cell count), myocarditis (inflammation of the heart muscle); metabolic syndrome (increased risk of stroke, heart disease, and diabetes), pulmonary embolism (blocked pulmonary artery), other cardiovascular issues, and seizures").

[50] *See, e.g.*, *Mental Health By The Numbers*, NATIONAL ALLIANCE ON MENTAL ILLNESS (April 2023), https://www.nami.org/about-mental-illness/mental-health-by-the-numbers/#mental-illness-and-the-criminal-justice-system ("About 3 in 5 people (63%) with a history of mental illness do not receive mental health treatment while incarcerated in state and federal prisons."); Christie Thompson & Taylor Elizabeth Elridge, *Treatment Denied: The Mental Health Crisis in Federal Prisons*, THE MARSHALL PROJECT (Nov. 21, 2018, 6:00 AM), https://www.themarshallproject.org/2018/11/21/treatment-denied-the-mental-health-crisis-in-federal-prisons ("A review of court documents and inmates' medical records, along with interviews of former prison psychologists, revealed that although the Bureau of Prisons changed its rules, officials did not add the resources needed to implement them, creating an incentive for employees to downgrade inmates to lower levels of care.").

[51] *See Glenn v. Quinones et al.*, Index No. 532736/2022 (Sup. Ct., Kings Cnty 2022) (settled); *Calderon v Bushwick Friendship LLC et al.*, Index No. 508049/2023 (Sup. Ct., Kings Cnty 2023) (pending).

## IV. <u>CONCLUSION</u>

For the foregoing reasons, we respectfully request that this Court impose a sentence consistent with the Probation Department's recommendation of time served plus two years of supervised release, with special conditions relating to mental health treatment, medication compliance, and substance abuse evaluation and/or treatment, as the Court sees fit to impose.

Dated: New York, New York
October 9, 2024

Respectfully submitted,

GREENBERG TRAURIG, LLP

By: <u>/s/ Daniel P. Filor</u>
Mark Lesko
Daniel P. Filor
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 801-9200
Facsimile: (212) 801-6400

*Attorneys for John Shepard Lhota*